UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


BLUE CROSS & BLUE SHIELD OF      :
RHODE ISLAND                     :
        Plaintiff,           :          C.A. No. 09-317-L
                     :
     v.                          :
                     :
                     :
JAY S. KORSEN and IAN D.         :
BARLOW                           :
        Defendants           :


**PRE-TRIAL MEMORANDUM OF PLAINTIFF
BLUE CROSS & BLUE SHIELD OF RHODE ISLAND**


STATEMENT OF FACTS TO BE PROVED

This civil action arises out of contracts between plaintiff Blue Cross & Blue Shield of

Rhode Island ("BCBSRI") and defendants Jay S. Korsen ("Korsen") and Ian D. Barlow

("Barlow"). The contracts are denominated as a Participating Physician Agreement (Korsen)

and a Participating Provider Agreement (Barlow). Korsen's and Barlow's provider contracts

with BCBSRI were identical in the provisions material to this litigation, and will at times be

referred to collectively as the "Provider Agreement," or "Agreement."

BCBSRI is a non-profit hospital and medical service corporation that provides pre-paid

medical care to its subscribers. Korsen and Barlow are providers of medical care, Korsen as a

chiropractor and Barlow as an occupational therapist. Barlow was employed by Korsen's

chiropractic practice. As participating providers in the BCBSRI network, Korsen and Barlow

agreed to provide Covered Services to all BCBSRI insureds (referred to as "Subscribers").

"Covered Services" are defined in the Provider Agreements as

> those services which are (i) medically necessary, (ii) within the scope of the Physician's
> license …(iii) in accordance with the same standards of care as offered to such
> Physician's other patients, (iv) in accordance with applicable standards for patient care
> and appropriate utilization of inpatient, ambulatory, ancillary and emergency services, (v)
> in accordance with all applicable laws, regulations and rules of professional ethics, and
> (vi) described as "covered services" in accordance with the respective agreements from
> time to time in effect between [BCBSRI] and its Subscribers … .

BCBSRI also has agreements with its Subscribers which set forth the health care services

covered for the Subscriber; they contain the following language, or its functional equivalent,

defining the "Physical/Occupational Therapy" category of Covered Services (emphasis in

original):

> Physical and/or occupational therapy is covered only when a *program* is implemented to
> restore the highest level of independent functioning in the most timely manner possible
> and:
> - physical or occupational therapy is received from a licensed physical or
>   occupational therapist;
> - the therapy will result in significant, sustained measurable functional/anatomical
>   improvement of your condition; and
> - such improvement will not diminish with the removal of the therapeutic agent or
>   environment.

BCBSRI Subscriber agreements deny coverage for massage therapist services or massage

by mechanical device.

Under the Provider Agreement, Korsen and Barlow agreed to accept fees according to

BCBSRI's fee schedule for all services provided to Subscribers.  Other than co-payments

collected from patients in accordance with the applicable Subscriber agreements, Korsen and

Barlow were paid directly by BCBSRI for all Subscriber treatments (and were prohibited from

collecting anything other than the co-payments from Subscribers unless they obtained

appropriate waivers as detailed in the Provider Agreement (not pertinent to this case)).  To

facilitate billing and payment, the Provider Agreement required Korsen and Barlow to submit

claims to BCBSRI for Subscriber services using a uniform coding system:

> Claims for Covered Services shall be submitted by the Provider on a claim form
> approved by [BCBSRI] or electronically, in a timely manner, consistent with the rules,
> regulations, policies and procedures of [BCBSRI]. …

The BCBSRI Administrative Policies (incorporated into the Provider Agreement by

reference), provided:

> [BCBSRI] uses the nationally recognized coding system known as AMA Physician's
> Current Procedural Terminology ("CPT") for basic coding, description of services and
> rules for the service provided. …

The CPT coding system was developed by the American Medical Association to assign a

distinct numerical code for all medical procedures.  The CPT provides a uniform system for

identification of medical treatments and procedures for billing, medical statistics, and other

record-keeping purposes, and is used by health insurers for billing by and payment to health care

providers throughout the United States.

Billing and payment for provider services are largely accomplished electronically.  The

Provider Agreement contained clear provisions making Korsen's and Barlow's receipts of

payments from BCBSRI subject to BCBSRI's right of recovery or reimbursement in the event

that BCBSRI determined that claims had been paid in error:

> Whenever payments have been made by [BCBSRI] to the Provider in excess of the
> amount owed pursuant to and in accordance with the terms of this Agreement or for
> services that have been determined by [BCBSRI] to have been medically inappropriate,
> [BCBSRI] shall have the right to recover such payments. ….

The Administrative Policies included the same provision in greater detail, and

specifically providing for recoupment by BCBSRI of improperly paid claims from future

billings:

Whenever payments have been made by [BCBSRI] to the Participating Physician/Provider in excess of the proper amount of payment pursuant to the terms of these policies and the fees or modalities in place at the time the services are rendered, or whenever payments have been made to the Participating Physician/Provider for services that have been determined by [BCBSRI] to have been not Medically Necessary, [BCBSRI] has the right to recover any such payments, and the Participating Physician/Provider shall promptly refund such overpayments *or [BCBSRI] shall offset such overpayments against future payments to such Physician/Provider, at the election of [BCBSRI]* (emphasis added).

In late 2008, BCBSRI received a complaint from a Korsen and Barlow patient who asserted that BCBSRI had been billed by Korsen's practice for provision to her of physical therapy when she had received no such treatment.[1]  In its preliminary, internal investigation of the complaint, BCBSRI discovered that Korsen and Barlow were extremely active in the use of CPT Code 97012, the billing identifier for "mechanical traction."  Mechanical traction is the delivery of traction with the use of a mechanical device.  Traction and mechanical traction are usually performed by a physical therapist, rather than chiropractors and occupational therapists.

On further investigation, BCBSRI learned that Korsen's practice was responsible for a significant portion of all of the claims submitted by all Rhode Island providers for mechanical traction (including all physical therapists, who usually perform traction).  For example, his practice billed for more mechanical traction services than a substantial physical therapy center comprising numerous physical therapists, which was associated with the largest orthopedic medical practice in the State.  Korsen and Barlow's claims under code 97012 between 2003 and 2009 amounted to more than $400,000.  Because it seemed anomalous that a single office with just one chiropractor and one occupational therapist would be so dominant in the provision of mechanical traction in Rhode Island, the traction charges became the focus of the BCBSRI investigation.

---

[1] After Subscribers receive a medical service paid for by BCBSRI under a Subscriber agreement, BCBSRI issues to the Subscriber an Explanation of Benefits showing the service and BCBSRI's payment.

On January 6, 2009, a BCBSRI investigator telephoned Korsen to request a meeting with him at his office.  Such a field audit of a provider's offices is a common practice for BCBSRI, and is expressly provided for in the Provider Agreement.   Dr. Korsen resisted the site visit.  He initiated a string of correspondence with BCBSRI in which he requested, among other things that the meeting be videotaped and that his counsel be present, conduct that was highly unusual in BCBSRI's experience.

In his January 6 call, the BCBSRI investigator made no mention of any topic to be discussed at the requested visit.  However, Dr. Korsen apparently surmised that the visit was related to his billings to BCBSRI under CPT Code 97012.  Although his office had been submitting claims under that code numbering in the dozens per day, he stopped submitting these claims almost immediately after the call. His office generated only six more such claims after January 6, the last on January 14, 2009.

The meeting ultimately took place March 11, 2009, at Dr. Korson's office.  During the visit, Korsen and Barlow revealed that their "mechanical traction" treatment consisted of placing patients on a motorized chair marketed by its manufacturer as the "Omega Montage 3000 Massage Chair," or to a lesser extent, on a motorized table.  They had three massage chairs and two tables, all set up in a single room in Korsen's office.  The chair and table functioned in the same manner: while the patient sits on the chair or lies on the table, a small car moves back and forth on a track within the chair or table.  Rollers that are attached to the car press into the patient's back as the car moves along the track.  Korsen and Barlow billed BCBSRI $75 for 15 minute sessions on the chair or table, of which the patient paid some portion as a co-payment or deductible, with the balance paid by BCBSRI under the Provider Agreement.  The total income,

including co-payments, deductibles, and paid BCBSRI claims, that they had generated with their chairs and tables was more than $500,000 since 2003.

Korsen's and Barlow's revelation of how they had been collecting fees under CPT Code 97012 took BCBSRI aback.  To its knowledge, no provider had ever billed the use of such a device as mechanical traction; it had never heard of it being done anywhere else in the country. In response to BCBSRI's questions regarding justification for the charges, Dr. Korsen stated that he possessed a letter from the chair manufacturer that explained how it performed traction. BCBSRI requested that Korsen and Barlow provide it with that letter and any other documentation that they had to support their position that the table and chair indeed performed traction on patients.

Two days after the visit to his office, Korsen submitted to BCBSRI a one page letter/brochure  titled "Description of Traction as applied with an Omega Massage Chair," dated March 12, 2009, which purports to explain how the massage chair performs traction.  The Omega letter identifies its author as Joe Nagabayashi, "Master Technician/R & D team member" of the Omega Massage Company. Korsen also sent BCBSRI three pages of vague information on the table.

Dr. Korsen had significant personal involvement in the creation of the Nagabayashi letter from Omega that he submitted in his attempt to justify his billing the use of the chair as traction. An e-mail dated February 2, 2009 to Dr. Korsen from an Omega sales representative thanked Dr. Korsen for his "very descriptive email on the definition of mechanical traction by your insurance company" (Dr. Korsen has never produced his descriptive e-mail to Omega, claiming that it was lost by his computer).   The March 12, 2009  Nagabayashi letter followed.  There is considerably less to the letter than appears at initial glance.

At deposition on April 26, 2011, Mr. Nagabayashi testified that he is not a "R & D team member" and did not write the letter.  He is a service man for Omega massage chairs who is sometimes dispatched to make repairs of broken machines.  He has no medical training, and has conducted no research regarding the massage chair's ability to perform traction.  He testified that he had never seen the letter before being served with the deposition subpoena, to which it was attached as an exhibit.

Dr. Korsen's assertion, through Mr. Nagabayashi, that his chair and table provide traction, is wrong.  Traction is a therapeutic modality that works by imposing a separation force on a body part.  The structure of the spine provides a good illustration of the nature and effect of traction, and the reason that Dr. Korsen's machines do not perform traction.  The spine is made up of individual vertebrae which are separated by flexible tissue called discs.  The spinal cord runs the length of the spinal column, within the openings at the posterior of the vertebrae; spinal nerves branch out from the spinal cord and exit the vertebral column, also at the posterior of the vertebrae.  Dislocation and malformation of the discs can cause pain and discomfort if the discs impinge on the spinal cord or the spinal nerves; arthritis and other aging processes can also impinge on the spinal nerves, causing pain and discomfort.

Traction can be used in an effort to ease the discomfort caused by impingement on the spinal cord and/or spinal nerves.  Traction is applied by exerting a pulling force along the longitudinal axis of the spine.  Typically, harnesses of some kind are placed on the upper and lower torsos.  One harness is held stationary, and the other is pulled away.  The resulting longitudinal tension along the spine between the harnesses causes a distraction, or increase of the separation, between the vertebrae in that portion of the spine.  The increase in intervertebral separation caused by the traction can have the effect of pulling the disc back to its proper

location (and away from the spinal cord/spinal nerves, thus reducing impingement), or increasing the openings in the vertebral column through which the spinal nerves exit, similarly reducing impingement of bone/arthritic growth on those nerves.

Dr. Korsen's machines do not place any longitudinal force on the spine, and do not cause separation of the vertebrae. They work by causing a roller to impart a transient force against the back of the spine as the roller rides up and down a track within the table or chair while a patient lies in/on it. The physiological effect of the roller is to cause the spine to bend very slightly over the roller. The result of this bending is that the separation between the vertebrae is very slightly increased at the front of the spine, directly opposite the roller, and decreased at the rear, which is where the spinal nerves and spinal cord are. Thus, in a patient with impingement on spinal nerves from the surrounding vertebrae, the effect of the Korsen machines is actually to decrease the separation between the vertebrae at the location of the nerve roots, with a likely increase in impingement on the nerves.

After a review of the Omega Massage brochure and the scant material regarding the Heritage table provided by Korsen, and making investigation of its own, BCBSRI concluded that the chair and table do not perform mechanical traction. It determined that billing the use of this equipment under CPT Code 97012 was improper, and an intentional misrepresentation. In a letter dated April 20, 2009, BCBSRI notified Korsen and Barlow of its determination, demanding reimbursement of the improperly billed charges, and requesting that they respond within 10 days to discuss repayment options. Korsen and Barlow did not respond as requested, but on May 4, 2009 submitted what they characterized as a "Level I Appeal of Claim Denials." BCBSRI denied that appeal by letter of May 21, 2009.

BCBSRI exercised the offset provision of the Provider Agreement to recover the overpayments made to Korsen and Barlow on account of their improper charges under CPT Code 97012. BCBSRI processed their claims for services to patients and then recorded the payment for all approved claims as a credit against the outstanding balance due for the past improper billing under CPT Code 97012. BCBSRI issued settlement statements to Korsen and Barlow that itemized the approved claims, and then showed the approved, paid amounts being recorded as "recoupment." While there was not a transfer of cash to Korsen and Barlow for such approved claims, they were in fact paid, with the payments recorded as a reduction in their debt to BCBSRI.

BCBSRI recouped a total of just $36,475.56 of the approximately $413,000 owed by Korsen and Barlow. Its recoupments against Korsen stopped when Korsen ended his provider relationship with BCBSRI; recoupments against Barlow ended by agreement after Barlow sought an injunction against further recoupments pending the outcome of this litigation.

Many of the health care plans from which BCBSRI made payments to Korsen and Barlow for their 97012 claims were BCBSRI fully-insured plans. Others are called "self-funded plans," which is a health plan, such as a union welfare benefit plan, which itself collects premiums and pays out claims. Also, some of the health care plans from which BCBSRI made payments to Korsen and Barlow for their 97012 claims involved plans administered by other Blue Cross Blue Shield insurers. BCBSRI does not administer those plans and instead, through the Blue Cross and Blue Shield Association's Blue Card program, BCBSRI only prices and processes the claims pursuant to BCBSRI's reimbursement policies and procedures and the coverage and medical necessity determinations made by the other Blue Cross Blue Shield insurers. The other Blue Cross Blue Shield insurers then reimburse BCBSRI for any payments

that were made to Korsen and Barlow through an account reconciliation process.   BCBSRI acts

as the administrator of such plans, but does not itself insure the risk.  The plans are both ERISA

welfare  benefit plans and non-ERISA.

      When BCBSRI effects a recoupment of payments made to a provider from a self-funded

plan, it will allocate the recouped moneys back to that plan.  However, because recoupments in

this case were stopped at an early stage (less than ten percent of the total), BCBSRI has not yet

made an accounting of the recouped funds.  BCBSRI does not allocate recouped moneys to plans

and internal accounts until the recoupment process is complete.  Until recoupment is either

accomplished in full or concluded with a settlement, BCBSRI cannot make a determination of

the appropriate share of the recouped funds to be allocated to self-funded plans which had paid

claims that were later recouped.  Hence, the money recouped so far from Korsen and Barlow is

being held by BCBSRI pending final resolution of this litigation.

TRAVEL OF THE CASE

      BCBSRI filed suit against Korsen and Barlow in Rhode Island state court in June, 2009,

The complaint was in three counts, breach of contract, fraud, and defamation (against Korsen

only).  BCBSRI amended the complaint before answers were filed to include a count of tortious

interference with advantageous business relationships, again against Korsen only.  Korsen and

Barlow removed the litigation to this Court on July 17, 2009, asserting complete preemption

under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.

Following briefing and argument, this Court denied BCBSRI's motion to remand.  The Court

held that BCBSRI's breach of contract and fraud claims for payments made to the defendants

from ERISA plans  were both converted into ERISA enforcement actions pursuant to 29 U.S.C.

§ 1132(a)(3).  Memorandum and Order, October 27, 2010 (Document 53), at 19.  The Court

10

stated its intention to try the exercise its supplemental jurisdiction over BCBSRI's state law

claims against the defendants for payments made from non-ERISA plans.  *Id.*  The Court also

bifurcated the case, severing the state law defamation and tortious interference counts.

BCBSRI does not waive its position with respect to ERISA pre-emption, which was

extensively briefed and argued in connection with its motion to remand.  Those arguments will

not be repeated here.  This pre-trial memorandum addresses the ERISA claims.

## LEGAL ANALYSIS AND AUTHORITIES

1. <u>BCBSRI's Reimbursement Claim</u>

The applicable portion of the ERISA enforcement statute, 29 U.S.C. § 1132(a)(3),

provides that

A civil action may be brought –

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice
which violates any provision of this subchapter or the terms of the plan, or (B) to
obtain other appropriate equitable relief (i) to redress such violations or (ii) to
enforce any provisions of this title or the terms of the plan....

The health insurance plans that BCBSRI administers are predominantly employee

welfare benefit plans subject to ERISA.  ERISA defines a fiduciary to include a party

with "any discretionary authority or discretionary responsibility in the administration of

[an employee benefit] plan."  29 U.S.C. § 1002(21)(A)(iii).  In its administration of

employee health insurance plans, BCBSRI among other things exercises discretionary

authority to review and approve or deny claims by participants and beneficiaries of the

plan for plan benefits.  That role constitutes BCBSRI an ERISA fiduciary in its

administration of the plans.  *Libbey-Owens-Ford v. Blue Cross and Blue Shield of Ohio*,

982 F.2d 1031,  1035 (6th Cir. 1992) ("When an insurance company administers claims

for an employee welfare benefit plan and has authority to grant or deny claims, the company is an ERISA 'fiduciary' under 29 U.S.C. § 1002(21)(A)(iii)").

The Provider Agreement permitted Korsen and Barlow to submit charges to BCBSRI only for "Covered Services" within the meaning of the Subscriber agreements. In relevant part, the Subscriber agreements define the criteria for covered physical therapy services. Mechanical traction, billable under CPT Code 97012, is a Covered Service under the Subscriber agreements, but "massage" administered by a mechanical device is not.

When Korsen and Barlow submitted and were paid for claims for mechanical traction when they did not in fact provide that therapy to their patients, they breached the Provider Agreement. They also caused a violation of the ERISA plans, by extracting payments from ERISA plan funds through false pretenses.

The ERISA enforcement statute permits a fiduciary to obtain as redress for violations of ERISA plans injunctive and "other appropriate equitable relief." In *Mertens v. Hewitt Associates,* 508 U.S. 248 (1993), the Supreme Court construed this provision to preclude an action for compensatory damages, since money damages are a legal, not equitable remedy. *Id.*, 508 U.S. at 256-7. In *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002), the Supreme Court applied this analysis in the context of a personal injury settlement, under which the majority of the settlement amount was placed in a Special Needs Trust, established pursuant to California statute, for the benefit of the injured plaintiff. Great-West, an ERISA plan's assignee which had paid out significant sums for medical care for the injured plaintiff, sued the plaintiff to recover its expenditures for the plaintiff's health care treatment for the injury, in accordance with a

third-party reimbursement obligation in the ERISA plan.  The Supreme Court held that the plan's suit against the tort plaintiff was an action at law to impose personal liability, which was barred under *Merten* because "the funds to which petitioners claim an entitlement under the Plan's reimbursement provision … are not in the respondents' possession," but rather in the Special Needs Trust.  *Id.*, 534 U.S. at 214.

*Sereboff v. Mid Atlantic Med. Svcs., Inc.*, 547 U.S. 356 (2006) also arose from a suit to recover payments made for medical treatment provided to a tort plaintiff, but reached the opposite result from that in *Great-West*.  In *Sereboff*, the Supreme Court made clear that the operative fact that precluded the reimbursement action in *Great-West* was the placement of the settlement funds into a trust that was beyond the reach or legal entitlement of the injured plaintiff.  The Sereboffs were injured in an automobile accident, and had health insurance under an ERISA plan that required participants to reimburse the plan for benefits paid if they recovered a damages settlement from any third party.  *Id.*, 547 U.S. at 360.  The Sereboffs obtained a personal injury settlement and failed to reimburse the plan, which then sued them to enforce the reimbursement right.  The Sereboffs resisted, on the basis of *Mertens* and *Great-West*.

The Supreme Court distinguished those two cases, and held the Sereboffs liable for the plan's claim.  There were two bases for the *Sereboff* ruling.  First, the Sereboffs' health insurance plan contained language by which they agreed to make reimbursement to the plan for plan expenditures for medical care for an injury if they received a third party damages payment on account of the injury.  And second, the third party payment was received directly by the Sereboffs and/or their attorney, not by a trust (as was the case in *Great-West*).  The Court applied to the plan's reimbursement provision an analysis articulated by Justice Oliver Wendell Holmes in *Barnes v. Alexander*, 232 U.S. 117 (1914), reciting "the familiar rul[e] of equity that a contract

13

to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets title to the thing," *Sereboff*, *supra*, 547 U.S. at 363-4 (brackets in original, quoting *Barnes, supra*, 232 U.S. at 121). The Court held that the Sereboffs' promise to pay over to the ERISA plan from any damages award the plan's expenditures for their medical care was contract, like the one addressed in *Barnes*, to convey a specific object in advance of receiving it. By virtue of that contract, the Sereboffs, on coming into possession of the tort settlement, were trustees of that settlement fund for the benefit of the plan, up to the amount of their reimbursement obligation.

The Court rejected the Sereboffs' argument that *Great-West* required the identification of a specific fund in which the dollars were deposited and on which an equitable lien would be imposed before restitution could be compelled under 29 U.S.C. § 1132(a)(3). The ERISA plan reimbursement provision was "an equitable lien 'by agreement,'" which is "a different species of relief" from "an equitable lien sought as a matter of restitution." *Sereboff*, *supra*, 547 U.S. at 364-5. The Court held that the plan's suit against the Sereboffs to recover the money was enforcement of an equitable lien by agreement. This constituted "other appropriate equitable relief" within the meaning of 29 U.S.C. § 1132(a)(3). *Id*. Enforcement of an equitable lien by agreement does not require the identification of any specific asset in the hands of the defendant, and the plan's "inability to satisfy the 'strict tracing rules' for 'equitable restitution' is of no consequence." *Id.*, at 365.

In summary, *Sereboff* establishes that where a party by contract promises to pay over to its counterparty money that is received under defined conditions, that contract constitutes an equitable lien by agreement on such funds when they are received at some future date. The equitable lien by agreement makes the receiving party the trustee of those funds for the benefit of

the counterparty, in accordance with the terms of the contract.  Enforcing liability on the trustee

to make payment as required by the contract, without any tracing of funds, is "other appropriate

equitable relief" within the meaning of the ERISA enforcement statute.  *Longaberger Company*

*v. Kolt*, 586 F.3d 459, 467(6th Cir. 2009) ("an equitable lien by agreement does not require

tracing or maintenance of fund in order for equity to allow repayment"); *Gutta v. Standard*

*Select Trust Insurance Plans*, 530 F.3d 614, 621 (7th Cir. 2008); *McCandless v. Standard Ins.*

*Co.*, 765 F. Supp. 2d 943, 959 (E.D. Mich. 2011).

      The recovery/reimbursement provision of the Provider Agreement is identical in effect to

the third party recovery reimbursement provision of the subscriber agreement in *Sereboff*.

Korsen's  and Barlow's promises in the Provider Agreement to reimburse BCBSRI any fees

received "in excess of the proper amount" or "for services that have been determined …  to have

been not Medically Necessary" is a "contract to convey a specific object even before it is

acquired."  That contract constitutes an equitable lien by agreement on all funds paid by BCBSRI

to them pursuant to the Agreement that are in excess of what Korsen and Barlow are entitled to

be paid under the Provider Agreement and Subscriber agreements. The equitable lien by

agreement makes Korsen and Barlow trustees, for the benefit of BCBSRI, of the funds they

receive from BSBSRI and that are subject to the Provider Agreement's recovery provision.

Therefore, that Korsen and Barlow may have commingled or dissipated the funds, such that the

dollars are no longer traceable, is immaterial to BCBSRI's right of recovery.  BCBSRI's

enforcement of its equitable lien by agreement through imposition of a reimbursement obligation

on Korsen and Barlow is "other appropriate equitable relief" within the meaning of 29 U.S.C. §

1132(a)(3).

2.     Attorneys' Fees

ERISA provides that in "any action … by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).  In *Hardt v. Reliance Standard Life Insurance Co,* 130 S. Ct. 2149 (2010), the Supreme Court held that § 1132(g)(1) is not a "prevailing party" fee statute, but permits the Court to make an award, in its discretion, when such an award is "appropriate."  *Id.*, 130 S. Ct. at 2157 (abrogating the decision of the First Circuit in *Cottrill v. Sparrow, Johnson & Ursillo*, 100 F.3d 220 (1ˢᵗ Cir. 1996), 130 S. Ct. 2155, n. 2).  The appropriateness standard requires "some degree of success on the merits," but does not require a final judgment or decree in the party's favor as a prerequisite to a fee award.  *Id.* at 2158.  Once a party has satisfied this standard, the Court may consider the five factors enumerated in *Cottrill, supra*, as modified by *Hardt. Id.*, n. 8.

 The *Cottrill* factors are " (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e. his or her capacity to pay an award; (3) the extent (if at all) to which such an award would deter other persons acting in similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions."  100 F. 3d at 225 These five factors are "exemplary rather than exclusive." *Cook* at 124.  No particular factor is necessarily decisive and some may not even be appropriate to apply in a given case.  *See Sikorski v. Sikorski*, 930 F. Supp. 804, 813 (E.D.N.Y. 1996).  "An inquiring court may—indeed should—consider additional criteria that seem apropos in a given case."  *Cottrill, supra*.  A party moving for an award of attorney's fees in an ERISA action is not required to show bad faith on the part of the losing party, *Beauvais* at 33, but may show culpability through other factors.

16

The evidence summarized above clearly justifies an award of attorney's fees to BCBSRI. Four of the five *Cottrill* factors are strongly implicated.  Culpability here is the discord between the physiological effect caused to a patient who lies on the massage chair or table and the treatment modality of mechanical traction.  The chair and table do not provide traction.  That fact establishes that the defendants' billings under CPT Code 97012 were erroneous, and should not have been paid.  This discord is accentuated by the lack of any reasonable justification for the defendants' apparent belief that they could submit such billings.  Both are licensed professionals who ought to be conversant with the accepted meaning of the term traction.  Both had access to professional publications that could easily have answered any genuine uncertainty on the issue that they might have harbored.   Their persistence in extracting more than $400,000 of mostly ERISA plan funds for use of the massage chair and table, despite the lack of any justifiable basis for doing so, elevates the culpability to bad faith.  BCBSRI's determination that the erroneous billings were intentional is well-founded.

Imposition on the defendants of BCBSRI's fees and costs of pursuit of this litigation is an expression that conduct such as the defendants' should not and will not be tolerated.  It would certainly have a grave deterrent effect on any other health care providers who might contemplate similarly gaming the system for monetary gain.

BCBSRI's successful recovery of the defendants' ill-gotten gains has a manifold beneficial effect.  It is a reversal of a pernicious practice that had the effect of increasing the cost of medical care to all members and beneficiaries of ERISA and non-ERISA plans from which the payments to defendants were made.  It restores funds that rightfully belong to ERISA plans. It should have a strong deterrent effect on other health care providers.

The relative merits of the parties' positions is easily assessed.  The defendants have no legitimate justification for the billing practice they carried on for their financial gain.

Finally, the defendants' ability to pay should not be a consideration.  The proof at trial will establish sufficient basis for a finding of bad faith that there is no reason for the Court to consider how such an award may affect the defendants' financial resources.

3.     Defendants' Counterclaims

The defendants filed counterclaims to BCBSRI's complaint asserting that BCBSRI's effecting of recoupment of the payment for the improper billing under CPT Code 97012 were in violation of ERISA and breach of the Provider Agreement.  According to their answers to interrogatories, they claim that BCBSRI's demand for repayment of the $400,000 it paid them pursuant to claims submitted under CPT Code 97012, and partial recoupment of those funds, violated the provisions of ERISA concerning denial by an ERISA plan of benefits to a participant or beneficiary of an ERISA plan, 29 U.S.C. § 1133.

The statute on which the defendants rely for their counterclaims reads, in its entirety,

In accordance with regulations of the Secretary, every employee benefit plan shall—

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  Regulations promulgated under this section establish that the rights apply only when there has been an "adverse benefits determination."  *See* 29 C.F.R. § 2560.503-1(m)(4).

18

       A.     The Defendants Have No ERISA Claims Because Their Assignments Are Inadequate to Confer ERISA Standing.

The defendants have argued in previous submissions to the Court that their patients executed assignments to them of their ERISA benefits thereby conferring standing upon Korsen and Barlow to assert ERISA claims. There are multiple reasons why Korsen and Barlow's argument fails.

First, there is considerable doubt as to whether the defendants actually received assignments regarding the claims at issue. Indeed, Korsen admitted that he did not receive assignments of benefits for at least twenty of the Subscribers whose claims were the subject of the recoupments that were taken by BCBSRI.

Second, there was nothing for the Subscribers to assign to Korsen and Barlow and Korsen and Barlow can receive no right or interest by virtue of the assignment. The payments at issue in the litigation are not "benefits" within the meaning of ERISA. While that term is not itself defined in ERISA, its meaning is clearly discernible from context. An ERISA benefit is a money payment or service to which a participant or beneficiary is entitled pursuant to the terms of an ERISA plan. When a health insurance plan reimburses a Subscriber for payments made by the Subscriber to a health care provider (as, for example, in care provided by a provider who has no direct contract with the insurer), the ERISA benefit is the Subscriber's reimbursement payment by the insurer.

But here, Korsen and Barlow were in direct contract with BCBSRI. The Provider Agreement required BCBSRI to make payment of the contracted fee to Korsen and Barlow after they provided a covered health care service to a Subscriber. That health care service, not BCBSRI's compensation to Korsen and Barlow for providing it, is the ERISA benefit. Any

dispute between BCBSRI and a provider over compensation has no effect on the delivery of the

ERISA benefit, which was complete on receipt of the service by the patient.  Thus, even if there

existed assignments from the Subscribers to Korsen and Barlow, that would not make Korsen

and Barlow beneficiaries with respect to BCBSRI, or make BCBSRI's contractual payments to

them ERISA benefits.  Once the Subscriber received a Covered Service from Korsen and/or

Barlow, the Subscriber does not have any further benefit due it from BCBSRI in connection with

the service, and there is nothing to assign with respect to that treatment.

Third, the defendants lack standing to assert their ERISA counterclaims because the

alleged assignments obtained by Korsen and Barlow are invalid.  The governing Subscriber

benefit agreements contain provisions prohibiting the participants from assigning their benefits

to health care providers.  Such anti-assignment clauses are valid and enforceable.  *See City of*

*Hope Nat. Med. Ctr. v. HealthPlus, Inc.*, 156 F.3d 223, 229 (1st Cir. 1998); *Morlan v. Universal*

*Guar. Life Ins. Co.*, 298 F.3d 609, 615 (7th Cir. 2002) ("[W]e hold that claims for welfare

benefits, not limited to health-care benefits, are assignable, provided of course that the ERISA

plan itself permits assignment, assignability being a matter of freedom of contract in the absence

of a statutory bar."); *Island View Residential Treatment Ctr., Inc. v. BlueCross BlueShield of*

*Massachusetts, Inc.*, No. 07-10581-DPW, 2007 U.S. Dist. LEXIS 94901, at * 18-20 (D. Mass.

Dec. 28, 2007) (dismissing provider's ERISA claim based on BCBSMA non-assignment

provision), *aff'd* 548 F.3d 24 (1st Cir. 2008); *Zhou v. Guardian Life Ins. Co. of Am.*, 2001 U.S.

Dist. LEXIS 21460, *5-7 (N.D. Ill. Dec. 14, 2001), *aff'd on other grounds*, 295 F.3d 677, 679

(7th Cir. 2002) ("Where the Plan prohibits assignment, courts generally enforce the anti-

assignment provisions and bar health care providers from bringing suit under ERISA."); *Wash.*

*Hosp. Center Corp. v. Group Hosp. & Medical Servs., Inc.*, 758 F. Supp. 750 (D.D.C. 1991)

(holding that an anti-assignment provision was valid and enforceable in ERISA case after concluding that enforcement of the provision was not contrary to public policy).

Simply because BCBSRI previously paid Korsen and Barlow for services rendered to BCBSRI's Subscribers pursuant to their provider agreements does not invalidate the anti-assignment provisions in the Subscribers' benefit agreements.  For instance, in *DeBartolo v. Health & Welfare Dep't of the Constr. & Gen. Laborers' Dist. Council of Chi. & Vicinity*, 2010 U.S. Dist. LEXIS 83940 (N.D. Ill. Aug. 17, 2010), the court enforced a plan's anti-assignment provision, even though the plan had made a partial payment of benefits to the provider and failed to inform him of the anti-assignment provision.  *Id.* at *11.  The court held "[b]ecause the Plan clearly and unambiguously prohibits the assignment of benefits that [the participant] made to DeBartolo and renders him unable to become a beneficiary of the Plan, he has no standing to assert his claims." *Id*. at *13.   *See also Gregory Surgical Services , LLC v. Horizon Blue Cross Blue Shield of New Jersey, Inc.*, 2007 U.S. Dist. Lexis 94056 (D.N.J. Dec. 26, 2007) (noting that Horizon's anti-assignment clauses can be waived through a course of conduct, but the waiver has to be clear, and mere direct payment to a provider is not waiver); *Pennsylvania Chiropractic Ass'n v. Blue Cross and Blue Shield Ass'n*, No. 09 C 5619, slip op. at 12-13 (N.D. Ill. Dec. 28, 2011).  No waiver occurred as to the anti-assignment provisions here.

Fourth, even if the defendants' assignments of benefits were not barred by an anti-assignment provisions in the Subscribers' benefit agreements, Korsen and Barlow's assignments of benefits fail to confer ERISA standing because their assignments only assign the limited right to receive payment due under the terms of the benefit plan directly from the Subscriber and do not assign the Subscriber's right to appeal a benefit denial, the Subscriber's notice rights or any other rights under ERISA.  Notably, the Department of Labor has expressly stated that an

assignment of benefits is a distinct concept from being designated as an authorized representative

that permits a provider to assert ERISA rights on behalf of a Subscriber:

> **Q-B2: Does an assignment of benefits by a claimant to a healthcare provider constitute the designation of an authorized representative?**
>
> **A: *No.*** An assignment of benefits by a claimant is generally limited to assignment of the claimant's right to receive a benefit payment under the terms of the plan. Typically, assignments are not a grant of authority to act on a claimant's behalf in pursuing and appealing a benefit determination under a plan. In addition, the validity of a designation of an authorized representative will depend on whether the designation has been made in accordance with the procedures established by the plan, if any.

DOL Compliance Assistance at Q-B2 (emphasis added).  An assignment of benefits alone is "not a

grant of authority to act on a claimant's behalf in pursuing and appealing a benefit determination

under a plan." *Id.*  An assignment of benefits that assigns to the provider the participant's right to

be paid by the insurer is different than the appointment of an authorized representative, which

permits the provider to pursue the participant's administrative remedies under the plan.

Korsen conceeds that the assignment of benefits form that he uses states that the patient is

assigning the right to payment, not any other benefits.  He also admits that the assignments from

his patients do not specifically assign the right to appeal, and that he could have expressly included

the right to appeal in the form he drafted, but he did not.[2]

---

[2] Moreover, Korsen and Barlow's ERISA counterclaims further fail as to those claims involving benefit plans administered by Blue Cross Blue Shield insurers other than BCBSRI for failure to obtain a proper authorized representative designation.  A plan need only provide notice and review to the participant's healthcare provider if the participant has expressly appointed the provider as an authorized representative.  *See* 29 C.F.R. § 2560.503-1(g) and (h).  As the Department of Labor has noted, whether a healthcare provider is properly designated as a participant's authorized representative will depend upon the circumstances:

> [A] plan may establish reasonable procedures for determining whether an individual has been authorized to act on behalf of the claimant.  Completion of a form by the claimant identifying the authorized representative would be one method for making such a determination. . . .

> [It] is important that both claimants and plans understand and make clear the extent to which an authorized representative will be acting on behalf of the claimant.  DOL Compliance Assistance at Q-B3.

Fifth, the purported assignments of benefits upon which Korsen and Barlow assert their ERISA counterclaims were not to Korsen or Barlow, but instead to Back to Health Chiropractic, a company owned by Korsen.  An assignment of benefits to Back to Health Chiropractic does not confer standing to either Korsen, the owner of Back to Health Chiropractic, or Barlow, a former part-time employee.

The assignments allegedly obtained by the defendants thus fail to confer standing to the defendants to assert their ERISA counterclaims.

> B.   There Was No Adverse Benefit Determination Regarding BCBSRI's Repayment Demands or Recoupments Because There Was No Additional Liability to the Subscribers.

None of BCBSRI's repayment demands or recoupments from Korsen and Barlow constituted an adverse benefit determination that would trigger ERISA's notice and appeal rights. Interpreting its own regulations, the Department of Labor states that an adverse benefit determination does not occur when a plan pays less than a provider's full billed charges unless the participant is financially liable for the unpaid balance:

> **Q-A8: Do the requirements applicable to group health plans apply to contractual disputes between healthcare providers (e.g., physicians, hospitals) and insurers or managed care organizations (e.g., HMOs)?**
>
> A:  No, provided that the contractual dispute will have no effect on a claimant's right to benefits under a plan. The regulation applies only to claims for benefits. (See Questions A-3, A-4, and A-5.)  The regulation does not apply to requests by healthcare providers for payments due them — rather than due the claimant — in accordance with contractual arrangements between the provider and an insurer or

---

DOL Compliance Assistance at Q-B1 and Q-B3.  Many of the Blue Cross Blue Shield insurers and their benefit plans adopted specific policies and procedures that participants must follow in order to designate an authorized representative, including that a participant complete and send in a specific form in order for a designation to be effective.  Korsen and Barlow failed to follow these specific procedures.  Ensuring that the specific procedures established by the insurers and the corresponding benefit plans for designating an authorized representative are followed, including completion of the designated authorized representative form, is essential so that the insurers and benefit plans know whose rights are being asserted through an appeal, particularly when a provider is asserting that he or she is pursuing the appeal in lieu of the plan participant, and so that participants are adequately informed as to the effect of designating an authorized representative.

managed care organization, where the provider has no recourse against the claimant for amounts, in whole or in part, not paid by the insurer or managed care organization.

The following example illustrates this principle. Under the terms of a group health plan, participants are required to pay only a $10 copayment for each office visit to a preferred provider doctor listed by a managed care organization that contracts with such doctors. Under the preferred provider agreement between the doctors and the managed care organization, the doctor has no recourse against a claimant for amounts in excess of the copayment. Any request by the doctor to the managed care organization for payment or reimbursement for services rendered to a participant is a request made under the contract with the managed care organization, not the group health plan; accordingly, the doctor's request is not a claim for benefits governed by the regulation.

On the other hand, where a claimant may request payments for medical services from a plan, but the medical provider will continue to have recourse against the claimant for amounts unpaid by the plan, the request, whether made by the claimant or by the medical provider (e.g., in the case of an assignment of benefits by the claimant) would constitute a claim for benefits by the claimant.

United States Department of Labor, Employee Benefits Security Administration (EBSA), United States Department of Labor, Employee Benefits Administration (EBSA), Compliance Assistance for Group Health and Disability Plans Benefit Claims Procedure Regulation (29 CFR 2560.503-1) ("DOL Compliance Assistance") at Q-A8, *available at* http://www.dol.gov/ebsa/pdf/ CAGHDP.pdf.  Thus, if a recoupment results in a plan paying less than the provider's billed charges, but the participant does not have to pay the difference, the plan need not provide ERISA-compliant notice and review.  Rather, a plan's decision to pay less than a provider's full billed charges *does not* trigger ERISA's notice and review requirements *unless* the participant is financially responsible for the unpaid balance.  *Id.*.

This limitation on the notice and review requirements is consistent with the purpose of ERISA's notice and review requirements, which is to protect plan participants by ensuring an opportunity to appeal any benefits determination that adversely affects them (not their healthcare providers).  *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th Cir. 1992) (noting that the goal

of ERISA's notice and review requirements is to "ensure[] that a full and fair review is conducted by the [plan] administrator, enable[] the claimant to prepare adequately for appeal to the federal courts or further administrative review, and make[] it possible for the courts to perform the task, entrusted to them by ERISA, of reviewing that denial.")

In this case, for Korsen and Barlow's claims involving BCBSRI's mere request for repayment, there is no adverse benefit determination because as long as Korsen and Barlow still retain the funds previously paid by BCBSRI, Korsen and Barlow have no claim against the Subscribers who received the services. Moreover, even as to those claims in which the payments were actually recouped from Korsen and Barlow, there still was no financially liability to the Subscribers, and thus no adverse benefit determination. Korsen and Barlow's provider agreements with BCBSRI have a hold harmless provision prohibiting them from billing the Subscribers for services that are denied as not covered or not medically necessary, unless the services were rendered to the Subscriber at the Subscriber's request after it was explained to the Subscriber that the services may not be medically necessary and may not be reimbursed in whole or in part by BCBSRI and the Subscriber agreed in writing prior to the provision of the services to continue treatment with Korsen and Barlow at the Subscriber's own expense. Korsen and Barlow failed to fulfill these requirements. Accordingly, there is no risk to the Subscribers for obtaining additional liability. *See Hall v. Aetna Life Ins. Co.*, 2010 U.S. Dist. LEXIS 139369, at *3-4 (N.D. Fla. 2010) (plan participants who could not be balance billed by provider had no standing to sue under ERISA).

If a participant is not impacted in any way by a recoupment, there is nothing for him to appeal, either administratively through the plan or through the federal courts; he has not been harmed and cannot sue under ERISA. Indeed, in numerous cases, courts have held that when a

plan pays less than a provider's full-billed charges pursuant to the terms of the provider's agreement with an insurer, a legal claim challenging the amount due under the provider's agreement does not arise under ERISA.  *See, e.g., Concert Health Plan Ins. Co. v. Houston Nw. Partners, Ltd.*, 265 F.R.D. 319, 322 (N.D. Ill. 2010).[3]  .

      C.      The Defendants Have No Independent Section 502(a)(3) Claim.[4]

The defendants' counterclaims assert a claim for relief under Section 502(a)(1)(B) and Section 502(a)(3).  (*See* Document 10 at ¶¶ 5-6 and Document 11 at ¶¶ 4-5.)  Section 502(a)(3) is ERISA's "catchall" provision.  *Varity Corp. v. Howe*, 516 U.S. 489, 512 (1996).  It acts "as a safety net, offering appropriate equitable relief for injuries caused by violations that Section 502 does not elsewhere adequately remedy."  *Id.*  If relief is available to a plan participant, or their assignee, under Section 502(a)(1)(B), it is not available under Section 502(a)(3).  Here the relief the defendants seek under Section 502(a)(3) is available under Section 502(a)(1)(B) and so they cannot recover on their Section 502(a)(3) claim.

Section 502(a)(1)(B) expressly allows a participant "to enforce his rights under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  This is precisely what the defendants seek to do under their counterclaims—enforce plan terms relating to claims and appeals procedures.  The defendants cannot assert a claim for the same relief under Section 502(a)(3).  *See, e.g., Korotynska v. Met. Life Ins. Co.*, 474 F.3d 101, 105-06 (4th Cir. 2006) (ERISA participant whose benefits were terminated could not seek equitable relief under Section 502(a)(3) based on insurer's allegedly improper claims review procedures because she had adequate relief available

---

[3] *See also Lone Star OB/GYN Associates v. Aetna Health Inc.*, 579 F.3d 525, 530-31 (5th Cir. 2009) (provider's claim against claims administrator did not arise under ERISA Section 502(a) because there was no dispute that services were covered by participant's plan; dispute was over the amount of payment due under the provider agreement); *Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc.*, 187 F.3d 1045, 1051 (9th Cir. 1999) (same).

[4] By identifying in their interrogatory answers  29 U.S.C. § 1333 as the sole statutory source for their claim of ERISA violation, the defendants have waived  reliance on § 1332(a)(3) (ERISA § 502(3)(a)).  BCBSRI addresses § 1332(a)(3) here because it was cited in the defendants' counterclaims.

for that injury under Section 502(a)(1)(B)); *Tackett v. M & G Polymers, USA, LLC,* 561 F.3d

478, 492 (6th Cir. 2009) (affirming dismissal of 502(a)(3) claim where the plaintiffs "asked the

district court for recovery of health benefits due under plan . . . [,] a declaration of their rights to

health benefits under the plan, and an injunction prohibiting the plan administrator from

modifying or terminating . . . health benefits in the future" because "[a]ll of these remedies are

cognizable under Section 502(a)(1)(B)"). Accordingly, Korsen and Barlow do not have a Section

502(a)(3) claim.

　　　　ERISA is inapplicable to any dispute between BCBSRI and Korsen and Barlow

concerning payments made pursuant to the Provider Agreement.  Korsen and Barlow were not

entitled to any ERISA notification or review procedures concerning the dispute.  They have no

claim against BCBSRI for ERISA violations.

WITNESSES

Separate schedule appended to this memorandum.

TRIAL EXHIBITS

Separate schedule appended to this memorandum.


　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　BLUE CROSS & BLUE SHIELD OF
　　　　　　　　　　　　　　　　　RHODE ISLAND
　　　　　　　　　　　　　　　　　By its attorneys
　　　　　　　　　　　　　　　　　**R. DANIEL PRENTISS, P.C.**


　　　　　　　　　　　　　　　　　s/ R. Daniel Prentiss
　　　　　　　　　　　　　　　　　R. Daniel Prentiss (#0783)
　　　　　　　　　　　　　　　　　One Turks Head Place, Suite 380
　　　　　　　　　　　　　　　　　Providence, RI  02903
　　　　　　　　　　　　　　　　　Telephone: (401) 824-5150
　　　　　　　　　　　　　　　　　Facsimile:  (401) 824-5181
　　　　　　　　　　　　　　　　　dan@prentisslaw.com

27

## **CERTIFICATION**

I hereby certify that on this 13th day of April, 2012, this document was served by ECF to counsel of record.

| | |
|---|---|
| Alan R. Tate, Esq. | Robert J. Axelrod |
| Christy B. Durant, Esq. | D. Brian Hufford |
| Tate Latham & Durant, LLC | Susan J. Weiswasser |
| 321 South Main Street, Suite 402 | Pomerantz Haudek Grossman & Gross |
| Providence, RI  02903 | 100 Park Avenue |
| | New York, NY  10017 |

/s/ R. Daniel Prentiss