UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

BLUE CROSS & BLUE SHIELD OF
RHODE ISLAND,
    Plaintiff,

      v.                             C.A. No. 09-317L

JAY S. KORSEN and IAN D. BARLOW,
    Defendants.

### DECISION AND ORDER

RONALD R. LAGUEUX, Senior United States District Judge.

This is a dispute between, on the one side, Plaintiff health insurance company Blue Cross & Blue Shield of Rhode Island ("Blue Cross"), and, on the other, chiropractor Jay S. Korsen and his former employee, occupational therapist Ian D. Barlow, Defendants. The dispute concerns medical services provided by Dr. Korsen and Barlow to patients over a six-year period, and the bills they submitted to Blue Cross for those services. Blue Cross paid the bills, but now seeks reimbursement from Dr. Korsen and Barlow.

In June 2009, Blue Cross sued Dr. Korsen and Barlow in Rhode Island Superior Court, alleging four state-law causes of action: breach of contract and fraud against both Dr. Korsen and Barlow, and defamation and tortious interference with advantageous relationships against Dr. Korsen. Defendants removed the case to this Court, arguing that its resolution should be controlled by federal law, the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001 et seq.  Defendants also filed counterclaims, asserting that Blue Cross violated ERISA when it withheld payment to Defendants for undisputed medical services in an effort to recoup the amounts it had already paid for the contested services.

On Blue Cross's motion to remand the matter to state court, this Court ruled that federal jurisdiction was proper and that Blue Cross's claims for breach of contract and fraud were completely preempted by ERISA, 29 U.S.C § 1132(a)(3).  See Blue Cross & Blue Shield of R.I. v. Korsen, 746 F.Supp.2d 375 (D.R.I. 2010).  This Court subsequently denied Blue Cross's motion for reconsideration or, alternatively, to certify the issue of federal preemption to the Court of Appeals for the First Circuit. (ECF #64).  Despite Plaintiff's continued urging, the issue of ERISA preemption, having been addressed at length in two prior decisions, will not be revisited herein.

In February 2011, the Court denied Plaintiff's Motion to Dismiss Defendants' first counterclaim alleging that Blue Cross violated ERISA; and granted its motion to dismiss the second counterclaim for breach of contract, based again on ERISA preemption.

In February 2012, this Court heard Defendants' motion for summary judgment on Counts III and IV of Plaintiff's complaint. The Court granted Defendants' motion on Count IV for tortious

interference with advantageous relationships, based on the lack of evidence that Dr. Korsen's alleged defamatory statements about Blue Cross had caused the company any harm.  The Court denied the motion as to Plaintiff's claim for defamation, but severed this count from the ERISA count.  This count against Dr. Korsen only remains to be adjudicated at a trial by jury.

The ERISA claims proceeded to a nineteen-day bench trial in May and June 2012.  At the close of Defendants' case, Plaintiff requested an opportunity to present rebuttal evidence.  The trial reconvened for a day in September 2012 so that both sides could present additional evidence.  Over the next several months, this matter was fully briefed and is now in order for decision. Having reviewed the trial testimony, the many exhibits and the post-trial memoranda, the Court finds in favor of Defendants on the ERISA claims.

## Background

Jay Korsen received a Bachelor of Science degree in biological sciences from the State University of New York at Stonybrook, and graduated from Palmer College of Chiropractic in Davenport, Iowa, with a doctor of chiropractic degree in 1992. Following graduation, Dr. Korsen worked for Dr. Robert Strange of Mid-Hudson Chiropractic in Hopewell Junction, New York, for one year.  He then went to Tri-State Chiropractic in Lawrenceburg, Indiana, where he ran a satellite office for a year, before

opening his own office.  He and his family moved to Rhode Island in 2001, and Dr. Korsen established a chiropractic practice in Wakefield under the name of Back to Health Chiropractic ("Back to Health").

Ian Barlow graduated from Quinnipiac College in 2003 and received an M.B.A. from Bryant University in 2005.  He worked at St. Joseph's Hospital in Providence before being hired by Dr. Korsen in 2003 as an occupational therapist.

### In-Network Providers

Dr. Korsen and Barlow entered into Provider Agreements as "network providers" with Blue Cross, in 2001 and 2003 respectively.  As network providers, they agreed to provide medical services to Blue Cross subscribers, and agreed to be compensated by Blue Cross according to a discounted rate schedule.  They further agreed to provide Blue Cross subscribers only with services that were "medically necessary" and described as "Covered Services" in the agreements between Blue Cross and its subscribers.  The Provider Agreements state:

> Services determined by the Corporation not to
> be medically necessary shall not be
> reimbursed by the Corporation or charged to
> the Subscriber, except when such non-
> medically necessary services are rendered to
> the Subscriber at the Subscriber's request
> after it has been explained to the Subscriber
> that the services may not be medically
> necessary and may not be reimbursed in whole
> or in part by the Corporation and the
> Subscriber has agreed in writing prior to the
> provision of services to continue treatment

> with the Provider at the Subscriber's own
> expense.

(Ex. 20, section II, ¶ D).  On the same topic, the Provider
Agreements also include a "No Billing of Subscribers paragraph,"
prohibiting providers from billing subscribers for "Covered
Services listed in the Subscriber Contracts." (Ex. 20).
Applicable subscriber agreements were incorporated into the
Provider Agreements by reference.  The Provider Agreements also
include extensive procedures for resolving disputes between
providers and Blue Cross, including a two-level administrative
appeal procedure, and, in some cases, resort to an external
review agency.

Blue Cross administrative policies required that all
providers use an AMA-designed coding system known as the Current
Procedural Terminology (the "CPT code") to designate which
services had been performed on each patient. Blue Cross imposed a
$75 *per diem* payment cap, per patient, for chiropractic services.
While services were performed on patients as needed, services
rendered over and above the $75 limit were uncompensated.

When Dr. Korsen joined the Blue Cross network, he was
assigned a provider relations representative, Edison Bedoya.
Bedoya visited Back to Health from time to time to tour the
facility and to ensure that the business relationship was going
smoothly.  When Back to Health was audited by Blue Cross in 2001,

-5-

Bedoya told Dr. Korsen, "You passed with flying colors."

### *Korsen's practice*

Sometimes, a patient's therapy would conclude with a session on motorized equipment, including the Heritage 10 Intermittent Segmental Traction Table ("the Thomas Table") or the Omega Montage Chair ("the Omega Chair").  According to Dr. Korsen, approximately 22% of all Back To Health patients were treated on either the Omega Chair or the Thomas Table at some point in their chiropractic therapy.

If Dr. Korsen determined that treatment on the Table or Chair was necessary for a patient, Barlow had the patient recline on the equipment, while activating rolling discs under the equipment's upholstery which undulated up and down the patient's spine.  This equipment was marketed to chiropractors to perform intermittent segmental, or intersegmental, traction, and both Dr. Korsen and Barlow had been trained on the use of this type of equipment at their colleges.

On the bills Back to Health submitted to Blue Cross, this procedure was designated as "traction, mechanical" under CPT code 97012.  Back to Health's billing was complex, due to Blue Cross's *per diem* policy.  Dr. Korsen testified that he programmed his billing software so that Barlow could use a single code for a bundled group of therapies, as there was no need to list every service performed once the *per diem* had been reached.  However, a

-6-

patient's treatment file would reflect every procedure performed.
All bills submitted to Blue Cross were identified
with Back to Health's tax identification number, with a
designation indicating either Dr. Korsen's or Barlow's Blue Cross
provider identification number, depending on who performed the
services.

### *The investigation*

In late 2008, Blue Cross received an inquiry from a Back to
Health patient concerning a procedure on her Blue Cross benefits
form.  Although this issue was cleared up promptly (and resulted
from a discrepancy in Blue Cross's internal procedures), during
the review of Back to Health's billing records, Blue Cross's
Special Investigations Unit ("SIU") took note of the extent of
Dr. Korsen's billing for mechanical traction.  The SIU suspected
that Dr. Korsen might be using a type of spinal decompression
machine, the VAX-D, that had been previously identified by Blue
Cross as an uncovered service.  Because of these concerns, Blue
Cross SIU lead investigator Kenneth Sciarra arranged to visit Dr.
Korsen's office for what Sciarra described as "a friendly chat."

Dr. Korsen's efforts to try to find out the reason for the
visit, coupled with Sciarra's efforts to refrain from alerting
Dr. Korsen to its true purpose, resulted in an atmosphere of high
tension and suspicion on both sides prior to the visit.  A phone
conversation with a college friend at this time led Dr. Korsen to

-7-

discover, on the internet, a trove of chiropractors who had been subject to post-payment audits by insurance companies across the country, including other Blue Cross Blue Shield entities.  Dr. Korsen's friend referred him to an internet "e-book," written anonymously by someone who identified himself as a chiropractor and owner of a large volume clinic.  The writer describes in 38 pages of detail his Blue Cross Blue Shield[1] audit and recoupment demand, beginning with this introduction:

> I was targeted by BCBS in the spring of this year (2006) in what seemed like a routine records request and subsequent in-office audit.  It turned out to be anything but routine.  At first I thought this audit was due to the fact that we were such a large volume clinic, but I now know differently. We have found out BCBS is going after anyone and everyone, big or small.  It doesn't matter whether you see 60 visits or 600 visits; they are going after all chiropractic physicians.  From what I am hearing from friends and colleagues across the United States, what happened to me is starting to happen to other smaller offices and is spreading like a slow virus.

(Ex. 62).  To Blue Cross, Dr. Korsen's subsequent request to have a lawyer present at the 'friendly chat' seemed like an admission that he knew he was doing something wrong.

On March 11, 2009, Sciarra, along with Blue Cross counsel Russell Marsella and senior medical director Dr. Brian Wolf,

---

[1] This entity is not the Rhode Island-based entity which is party to the present lawsuit.

visited Back to Health.  Dr. Korsen and Barlow and their attorney
were present, and Dr. Korsen tape-recorded the proceedings.
During the visit, Sciarra asked Dr. Korsen about the high volume
of billings for mechanical traction.  Dr. Korsen replied that he
and Barlow used "mechanical intersegmental traction tables and
chairs in our office, and that's billed as mechanical traction."
(Ex. 40).  Dr. Korsen proceeded to show the Blue Cross group the
Tables and Chairs and explain how they worked.  As the SIU
representatives departed, Sciarra asked Dr. Korsen to provide
some written documentation on the equipment so it could be
reviewed by Blue Cross's medical advisors.  "Simple as that," he
added, encouragingly.

A couple of days later, Dr. Korsen sent Sciarra materials
from the Thomas and Omega companies.  The statement from Omega
was dated March 12, 2009, and was obviously prepared by an Omega
employee for this purpose.  It was titled, "Description of
Traction as applied with an Omega Massage Chair," and stated in
part: "The Omega Montage chair uses supine segmentation traction.
This is a 3-point bending method for spinal traction."  The
material from Thomas identified the equipment as the "Heritage
#10 Intermittent Segmental Traction Table," with "Motorized
Intermittent Segmental Traction.  The 8 Rollers with variable
speed vibration will deliver a gentle, relaxing massage."  (Ex.
41).  Thomas also produced the FDA registration listing for the

-9-

Table, identifying it as "H-10 Intermittent Segmental Traction Table."

These documents were received and reviewed by Blue Cross medical directors Dr. Wolf and Dr. Peter Hollmann, who determined that the Back to Health equipment did not render mechanical traction as it was commonly defined by the medical profession.

On April 20, 2009, Blue Cross sent Defendants a letter demanding repayment of $412,951.93, representing six years'-worth of miscoded billing for mechanical traction.  The letter stated that, "Although the manufacturers may label this 'intermittent segmental traction,' medically, it is not traction."  The letter continued:

> Our findings have identified that the correct
> reporting for these services would be the use
> of CPT code 97039, (Unlisted Modality).
> However, this service is not medically
> necessary as there is a lack of published
> peer-review literature to support its
> efficacy.  The use of CPT code 97012,
> (Application Traction, Mechanical) is
> considered an intentional misrepresentation
> of the service.  As a result, BCBSRI has
> identified an overpayment in the amount of
> $412,951.93.  This amount represents services
> of mechanical traction rendered from March,
> 2003 through April, 2009.

(Ex. 45).  The letter provided Dr. Korsen and Barlow with ten days to contact Blue Cross to discuss repayment options.

On May 4, 2009, Dr. Korsen and Barlow sent Blue Cross a letter to try to appeal the decision by questioning Blue Cross's

conclusions, and requesting further information about subscriber plans.  At the same time, Blue Cross began withholding payments due Back to Health for unrelated services.  The recoupment against Dr. Korsen and Back to Health continued until Dr. Korsen terminated his relationship with Blue Cross at the end of April. Because of the practice's ensuing financial difficulties, Barlow was compelled to leave Back to Health and establish his own practice.  Blue Cross continued to withhold payments from him until the Court enjoined Blue Cross to cease the recoupment.  By then, Blue Cross had withheld payment for other services in the amounts of $18,447.21 from Dr. Dr. Korsen and $14,481.56 from Barlow. (Ex. MMMM).

On May 21, 2009, Blue Cross counsel Russell Marsella responded to the appeal letter.  Marsella rejected the arguments contained in the letter, and added that, "BCBSRI is not seeking recoupment of any of these funds due to a medical necessity determination," but instead because "the services rendered do not fall under the proper description of that code." (Ex. 48).  He refused to reconsider Blue Cross's decision and closed by stating:

> Further note that in addition to BCBSRI's demand for the repayment of $412,951.93 as detailed in the April 20, 2009 letter to Dr. Korsen, BCBSRI further demands that Dr. Korsen reimburse members for any copayments, coinsurance and/or deductibles collected in connection with these services, which total $98,677.85.

-11-

The dispute culminated in this lawsuit, filed in 2009.

## Findings of Fact

Pertinent testimony presented at the bench trial focused on two main areas: 1) mechanical traction, including its definition, how the Thomas Table and the Omega Chair operate, and the use of this equipment in the chiropractic industry; and 2) the parties' conduct, including Dr. Korsen's history of using mechanical traction equipment, and Blue Cross's investigation into Dr. Korsen's billing.

### *1. Mechanical traction*

### *Definition*

The 2008 official CPT code book contains no definition for mechanical traction, code #97012.  It is included in a list of "supervised modalities," which are defined as: "Any physical agent applied to produce therapeutic changes to biologic tissue; includes but not limited to thermal, acoustic, light, mechanical, or electric energy."  As a frame of reference, code #97012 is listed between #90710: the application of hot or cold packs; and #97014: unattended electrical stimulation. (Ex. 96).

Dr. Korsen relied on the 2009 ChiroCode Deskbook for coding, although this reference book is not prepared by the AMA.  The ChiroCode defines mechanical traction as:

> The force used to create a degree of tension
> of soft tissues and/or to allow for

>            separation between joint surfaces.  The
>            degree of traction is controlled through the
>            amount of force (pounds) allowed, duration
>            (time), and angle of pull (degrees) using
>            mechanical means.  Terms often used in
>            describing pelvic/cervical traction are
>            intermittent or static (describing the length
>            of time traction is applied), or auto
>            traction (use of the body's own weight to
>            create the force).

(Ex. EEEE).

Plaintiff's witness Dr. Jeremy McVay, who has a doctorate in

physical therapy from Simmons College, described the structure of

the spinal discs to the Court as like jelly donuts cushioning the

bone segments of the vertebrae.  If a disc ruptures or becomes

herniated, some of the cushioning substance can slip out of

position, causing pain by pinching on the nerve.  Traction, the

pulling apart or "distraction" of the spine, creates suction

which causes the jelly donut to slide back into its proper

position.

### *Operation of the Thomas Table and Omega Chair*

On the key issue of whether or not the Thomas Table and the

Omega Chair performed traction, Dr. Korsen testified:

>            Well, when the roller passes underneath the
>            spine, underneath the back, it creates a
>            fulcrum, and the fulcrum pushes up, pushes up
>            from behind, so if a patient is lying supine
>            on their back and the roller comes
>            underneath, it creates this fulcrum.  Gravity
>            itself pulls actually from both sides,
>            opening the joint.

Using a Slinky toy to simulate the action of the rollers, Barlow

described the Table and Chair:

> The roller provides a force upward.  The
> weight of gravity pulls the patient's head
> down and also the legs down, and it provides
> a traction intersegmentally in certain
> segments of the spine as the rollers go up
> and down....So because the fulcrum, or the
> rollers in the Table and Chair, is wide, the
> force separates the vertebrae, increases
> space in the intervertebral foramen and takes
> the pressure off the nerves...It's wide,
> which is why it works and why our patients
> got well faster and why they came back
> requesting to see both Dr. Korsen and I and
> the use of traction using the Tables and
> Chairs because this alleviated their symptoms
> and helped them heal faster.

Dr. Brian Wolf, Blue Cross medical director, testified that his medical training included a five-year general surgical residency which covered orthopedics, prior to his becoming a surgical oncologist.  Dr. Wolf's notion of traction was more limited: it requires a force, longitudinal and parallel to the spine, which pulls the spine apart.  This force would usually be applied by attaching a belt or harness to stabilize one part of the patient's body, and then pulling on the other part.  Dr. Wolf identified this as "axial traction."  The distractive pull could possibly be accomplished with the force of gravity supplied by the patient's weight, which is sometimes called "autotraction."

Similarly, Plaintiff's witness Jeremy McVay opined that the roller table did not perform traction because the rollers push up against the spine, bending it rather than pulling it apart.  Both

-14-

Dr. Wolf and Dr. McVay argued that the roller mechanism, while opening some sections of the vertebrae, would compress other sections.

Dr. McVay described the machine used in his office for traction, which involves a pump and air pressure to pull on the spine. Notably, this description was not consistent with Dr. Wolf's limited definition of traction.  During his testimony, Dr. McVay also recalled being treated on a Spinalator, a machine similar to Dr. Korsen's, by a chiropractor in North Carolina.

The Court was not convinced by the testimony of Plaintiff's witnesses Dr. McVay and Dr. Wolf on the subject of whether or not the Table or Chair produces traction.  Their testimony was inconsistent and their definition of traction was restrictive and overly-limited.[2]

### *Prevalence of intersegmental traction in chiropractic field*

The practice of using a Thomas Table and Omega Chair, or similar motorized equipment with rollers, obviously went beyond Dr. Korsen's office and the office of Dr. McVay's North Carolina chiropractor.  This equipment was marketed to perform traction, as was demonstrated by the materials that Dr. Korsen sent to Blue Cross after the site inspection.  Moreover, equipment such as Dr. Korsen's appears to have been commonly used in the chiropractic

---

[2] During the trial, the Court refused to designate Dr. Hollmann as an expert in the area of mechanical traction.

community.  A brochure from the office of another Rhode Island
chiropractor advertises the use of a roller table for
intersegmental traction and mechanical traction, "for the purpose
of stretching spinal joints, increasing mobility." The brochure
continues, "Each of these machines has rollers that are brought
up under your back, helping to reduce tension, break up scar
tissue, hydrate discs, and bring new blood and fluids to the
area, helping your body to heal faster."  A brochure from the
United Hospital System in Wisconsin lists among its chiropractic
services:

> Mechanical Intersegmental Traction
> Intersegmental traction (IST) is a way of
> inducing passive motion into the spine, which
> will stretch spinal joints and increase
> mobility.  Traction is any applied mechanical
> force that is used to achieve motion.  During
> the procedure, the patient lies face up on a
> specialized table equipped with rollers
> beneath its surface.  The rollers slowly
> travel the length of the patient's spine.

(Ex. UUU).  A booklet providing a seminar for "Billing and Coding
Physical Medicine Services," included the use of the roller table
under the heading "97012 – Mechanical Traction." (Ex. WWW).

### *Medical literature*

Similarly, roller tables make occasional appearances in
medical literature.  A Tru-Trac roller table was used to provide
traction in an experiment reported in The Lancet in 1981.  While
all four therapies studied, including treatment on the Tru-Trac,

-16-

were found to be less effective individually, when the treatments were combined in any combination the results indicated improvement with little significant differences, and "[T]hose having traction or manipulation may have done better than those not..." (Ex. CCC).  An article from the <u>Journal of Chiropractic Medicine</u> included in its treatments "positional traction on an intersegmental traction table."  The article refers to the placement of the rollers, and includes a photo of the patient on the table, with no sign or mention of any harness or strap. (Ex. 68).

### *Is it mechanical traction?*

The Court finds that intersegmental traction performed on a roller table, such as the Thomas Table or Omega Chair, is a form of mechanical traction.  The testimony concerning the operation of the Table indicates that the pressure of the rollers serves to separate the vertebrae, in a manner similar to that achieved by other forms of traction.  The operation of the roller Table therefore fits the definition of mechanical traction provided in the ChiroCode book, and was properly coded by Defendants using CPT Code 97012.  The evidence demonstrates further that this equipment was marketed to perform traction and that its use for this purpose is widely accepted in the chiropractic community, or at least was so in the past.

### *2. The parties' conduct*

Central to Blue Cross's case is its allegation that Dr. Korsen acted with intent to defraud.  When it reviewed Back to Health's billing, Blue Cross became convinced that Dr. Korsen was intentionally miscoding his bills in an effort to be compensated for services Blue Cross concluded were uncovered.  Consequently, much testimony during the trial focused on Dr. Korsen's background and training as it might shed light on his state of mind.  As for Defendants' counterclaim over the monies recouped from them, testimony concerning Blue Cross's peremptory and impulsive decision-making process is significant.

***Korsen's past experiences with intersegmental traction equipment***

Dr. Wolf testified that Blue Cross was convinced that Dr. Korsen was engaging in fraud because no one with training in anatomy could believe that the Thomas Table or Omega Chair performed mechanical traction.  However, the testimonial evidence at trial demonstrated that Dr. Korsen had been instructed on the use of this equipment at chiropractic school, and had used the equipment in previous practices before he moved to Rhode Island.

Dr. Korsen testified that he was taught to use equipment similar to the Thomas Table and the Omega Chair at Palmer College of Chiropractic between 1987 and 1992, in a physiotherapy class and in a hands-on clinic which was part of his training.  Moreover, treatment on the motorized equipment in the clinic was

identified as mechanical traction for billing purposes.  Dr.

Korsen's physiotherapy textbook, written by his instructor,

Professor Morley, included "Intermittant (sic) Mechanical

Traction" in the chapter on Traction:

> 3. <u>Intermittant Mechanical Traction</u>
> The tractive force is alternately applied and
> released every few seconds.  Used with a
> split table and leg support in the lumbar
> area.  **Currently the most popular form of
> traction in the U.S.**
> Some patients relax better with intermittant;
> some find that the undulations initiate
> stretch reflexes which increases muscular
> resistance.

(Ex. 76)(emphasis added).  Four other types of traction are also

defined, including methods utilizing straps and harnesses such as

that described by Dr. Wolf.  In an affidavit, Professor Morley

confirmed that he taught students the use of intersegmental

traction table at Palmer College, and taught them that the device

provided a type of mechanical traction. (Ex. RRRR).

In a 2012 exchange of emails between Dr. Korsen and an

administrative assistant involved with insurance company billing

for the Palmer College Clinic, the administrative assistant told

Dr. Korsen that the Clinic used mechanical traction Code #97012

for billing when a patient is treated on the Clinic's

intersegmental traction table. (Ex. BBBB).

Plaintiff's rebuttal witness, Dr. Kevin Paustian, current

dean of academic affairs at Palmer College, testified in a

deposition as the designated witness for the College in July
2012.  He confirmed that the use of an intersegmental traction
table was taught at Palmer while Dr. Korsen was a student there.
Dr. Paustian also testified that when he purchased a chiropractic
practice in Arizona in the 1980s, the office came equipped with
an intersegmental traction table, although he never used it.

Barlow testified that he was taught to use the
intersegmental traction table while studying occupational therapy
at Quinnipiac College.  The tables were part of a program of
instruction in a modality lab, which also included axial traction
tables with harnesses, and other equipment.

Dr. Korsen testified that Dr. Strange's office in New York,
where he worked for one year after graduation, was equipped with
an intersegmental traction table.  Likewise, his office with Tri-
State Chiropractic in Indiana had four or five such tables, and
when Dr. Korsen treated a patient with the table, he would
identify the treatment by the CPT Code 97012, as he was trained
to do by his predecessor.  While at Tri-State, Dr. Korsen visited
the other ten Tri-State offices in Ohio and Kentucky and noted
that they were all equipped with intersegmental traction tables.
These other offices used the same billing software as Dr. Korsen
used, and he also concluded that they billed treatment on the
tables as mechanical traction, under CPT Code 97012.

When Dr. Korsen established his own office in Indiana, he

-20-

equipped it with several Thomas Tables, and billed the treatment under CPT Code 97012.  During this time, Dr. Korsen was involved in a dispute with an insurance company over an extensive and varied treatment program for one patient, which included treatment on the intersegmental traction table.  The treatment program, and billing, was reviewed by the State Board for the State of Indiana, and the treatment program and payment to Dr. Korsen was ultimately approved.  The persuasive evidence presented by Defendants concerning the prevalence of intersegmental traction equipment in the chiropractic field, along with Dr. Korsen's past experience using the equipment and identifying it as mechanical traction, completely rebutted Blue Cross's charge that Dr. Korsen committed intentional fraud with his Back to Health bills.

### Blue Cross's conduct: the investigation and fraud determination

Having had its suspicions raised by the volume of mechanical traction billing from Back to Health, Blue Cross chief investigator Sciarra scheduled the "friendly chat" with Dr. Korsen – really a fraud investigation in sheep's clothing.[3]  Dr. Korsen responded with apprehension, requesting an agenda and other specifics concerning which patient files would be scrutinized.  Dr. Korsen's anxiety had been fueled by his

---

[3] Kenneth Sciarra was unavailable to testify at trial, or by deposition, due to serious illness.

internet research into what was happening with chiropractors in other parts of the country.  Despite Dr. Korsen's concerns, the site visit was low-key and casual.  The Blue Cross team toured the office, and requested that Dr. Korsen simply forward them materials from the manufacturers of the Thomas Table and Omega Chair.  The Blue Cross team did not inspect or examine the Thomas Table and Omega Chair, nor did they see the equipment in operation.

When Blue Cross received the manufacturers' documentation, it was reviewed by its medical directors, Drs. Wolf and Hollmann. Dr. Wolf specializes in surgical oncology.  Dr. Hollmann specializes in geriatrics and is chairman of the AMA's editorial panel CPT coding.  No chiropractor, physical therapist or occupational therapist was involved in the review.

According to Blue Cross counsel Marsella, Dr. Wolf performed a "literature search."  Dr. Wolf testified that when he saw the equipment in Dr. Korsen's office, he concluded it was similar to the coin-operated massage chairs found at shopping malls.  (Dr. Wolf's sarcasm is indicative of his lack of expertise in the field of chiropractic.)  Nothing Dr. Wolf found in his literature search disabused him of this conclusion.  His mind was made up. Dr. Wolf made no inquiries of other chiropractors about the equipment, although he did speak with a medical doctor who specializes in physiatry from a local hospital.  Dr. Wolf made no

examination of the records of Dr. Korsen's patients.  Neither Dr. Wolf nor Dr. Hollmann examined any x-ray or MRI evidence of any of Back to Health's patients who had been treated on the controversial equipment.  Furthermore, no one at Blue Cross requested further information or documentation from Dr. Korsen.

In short order, Drs. Wolf and Hollmann concluded that treatment on the intersegmental traction equipment was not mechanical traction; no evaluation of medical necessity was made. Moreover, neither Dr. Wolf nor Dr. Hollmann made a written record or report of their investigation or findings.

Blue Cross's in-house counsel, Marsella, made the determination that Back to Health's billings were not only inaccurate, but fraudulent.  According to his testimony, this conclusion was based upon Dr. Korsen's reaction to the "friendly-chat" audit.  Marsella cited specifically: 1) Dr. Korsen's confidence during the audit when he explained that the machines performed traction; 2) his "evasive" conduct prior to the audit; for example, when he asked for an agenda beforehand;  3) his request to have a lawyer present during the audit; 4) his attestations that he did not support fraud; 5) the insufficiency of the documents he produced after the audit; and 6) the fact that Dr. Korsen stopped billing for mechanical traction around the time of the audit.  According to Marsella, Barlow's guilt was established partly because of his association with Dr. Korsen and

partly because, as a provider, he was deemed to be responsible for any billing that carried his provider identification number. Based on the SIU's conclusion that the billing was fraudulent, Blue Cross felt authorized to seek recoupment from Dr. Korsen and Barlow beyond the statutory two-year time period imposed by Rhode Island General Laws.[4]

### *The Court's factual conclusions*

The Court finds that Blue Cross has failed to establish by a preponderance of the evidence that treatment on intersegmental traction equipment is not a form of mechanical traction. The Court finds further that Blue Cross has failed to prove by clear and convincing evidence that Dr. Korsen and Barlow were engaging in intentional fraud or misrepresentation when they identified this service with the mechanical traction code 97012.

Blue Cross demanded immediate repayment of the $412,951.93, which is the amount it calculated was attributable to mechanical traction. Given the complexities of the *per diem* billing system, that conclusion is unreliable.

The Court finds that neither Dr. Korsen or Barlow was given any opportunity to appeal or have Blue Cross's determination reviewed, despite the inclusion of review procedures both under ERISA and the Provider Agreements. When Dr. Korsen and Barlow attempted to appeal Blue Cross's decision, the response was a

---

[4] R.I. Gen. Laws § 27-18-65.

demand that Dr. Korsen and Barlow return an additional $98,677.85 directly to their patients to reimburse them for co-pays and deductibles, although no one at Blue Cross had any knowledge as to whether or not Dr. Korsen or Barlow had actually collected those amounts from their patients.

Blue Cross's April 2009 letter demanding repayment cited three grounds for its request: 1) the services had been miscoded; 2) the service is "not medically necessary as there is a lack of published peer-review literature to support its efficacy;" and 3) the use of the mechanical traction code, 97012, was an intentional misrepresentation of the service.

Prior to 2009, including the six-year period of Dr. Korsen's disputed billings, Blue Cross had no policy concerning intersegmental traction. In the area of traction Blue Cross had only one published policy, which was that treatment on the vertebral axial decompression device, the so-called VAX D, was not a covered service. It appears that in June 2009 or shortly after, Dr. Hollmann drafted an advisory which was included in a provider policy update publication that stated:

> Roller Massage is Not Spinal Traction:  Some
> chair manufacturers label services for when a
> patient has been in a chair, or on a table
> that has rollers that move along the spine,
> as "intermittent segmental traction."  This
> is neither traction nor a one-on-one direct
> patient contact service.  While the correct
> reporting would be CPT code 97039, unlisted
> modality, note that this service is not
> medically necessary as there is a lack of

-25-

> published peer-reviewed literature to support
> its effectiveness.  Use of CPT code 97012 is
> improper and shall be considered intentional
> misrepresentation of the service.

(Ex. 51).

## Conclusions of law

In an earlier order, this Court invoked ERISA's powers of

complete preemption to convert Plaintiff's state law claims for

breach of contract and fraud to a single claim under ERISA 29

U.S.C. § 1132(a)(3)(B).  The pertinent clause of this civil

enforcement section provides:

> (a) Persons empowered to bring a civil action
> A civil action may be brought – (3) by a
> participant, beneficiary, or fiduciary (A) to
> enjoin any act or practice which violates any
> provision of this subchapter or the terms of
> the plan, or (B) to obtain other appropriate
> equitable relief (i) to redress such
> violations...

In this case, the "other appropriate equitable relief" sought by

Plaintiff is equitable restitution.

A claim under ERISA § 1132(a)(3)(B)[5] for equitable

restitution is the proper mechanism for an ERISA fiduciary's

claim to recoup monies or overpayments made in connection with

the terms of an ERISA plan.  See Vacca v. Trinitas Hospital, 2006

WL 3314637 (E.D.N.Y.); Aetna Life Ins. Co. v. DFW Sleep

Diagnostics Ctr., 2004 WL 1922033 (E.D.La.).  Moreover, it is the

---

[5] This section is sometimes designated as § 502(a)(3)(B).

only mechanism available to the Blue Cross Plaintiffs, as ERISA claims for damages for breach of contract have been explicitly prohibited by the Supreme Court.  <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 210 (2002).  ERISA section 1132(a)(3)(B) has been identified by the Supreme Court as a "catchall provision," providing "a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy."  <u>Varity v. Howe</u>, 516 U.S. 489, 512 (1996).

### *Equitable restitution*

The question of what constitutes equitable restitution has been the subject of extensive Supreme Court jurisprudence since the enactment of ERISA.  In 1993, in <u>Mertens v. Hewitt Associates</u>, 508 U.S. 248, 260, the Supreme Court announced that equitable relief must be limited to traditional divided-bench remedies, such as "restitution of ill-gotten plan assets or profits," injunction and mandamus.  This was refined further in <u>Great-West Life v. Knudson</u>, 534 U.S. at 213, which held that, "a plaintiff could seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." (emphasis in original).  The <u>Knudson</u> Court went on to explain that if the funds had been

-27-

dissipated while in defendant's possession, the plaintiff's claim was merely that of a general creditor because the plaintiff could only properly recover "particular funds or property in the defendant's possession." Id. at 214; see also Sereboff v. Mid Atlantic Medical Services, Inc., 547 U.S. 356, 362 (2006); Todisco v. Verizon Communications, Inc., 497 F.3d 95, 99 (1st Cir. 2007).

In Sereboff, the Supreme Court allowed the insurer's claim against its beneficiary to recoup benefit payments after the beneficiary recovered damages from a third-party tortfeasor.  The funds in question had previously been identified by the insurer who had asserted a lien on the proceeds from the Sereboffs' tort litigation.  Distinguishing Knudson, where the Court had not permitted a facially similar recovery, the Sereboff Court wrote, "...in this case Mid Atlantic sought specifically identifiable funds that were within the possession and control of the Sereboffs – that portion of the tort settlement due Mid Atlantic under the terms of the ERISA plan, set aside and preserved in the Sereboffs' investment accounts."  547 U.S. at 362-63 (internal quotations omitted).

### *Identifiable funds*

Many ERISA decisions since Great-West v. Knudson and Sereboff have focused on the nuances concerning the traceability of the funds claimed by plaintiffs but in the possession of the

defendants.  For example, in <u>Cusson v. Liberty Life Assurance Co.</u>, 592 F.3d 215, 231 (1st Cir. 2010), the First Circuit engaged in an extensive discussion of <u>Knudson</u> and <u>Sereboff</u> before ultimately concluding that the insurance company's counterclaim against Cusson for the overpayment of disability benefits was a proper, and meritorious, claim for equitable restitution under § 502(a)(3).  Cusson received Social Security benefits for the same time period that she collected disability benefits, a form of 'double-dipping' that was prohibited by her ERISA plan.  The Court held:

> It is true that, unlike the insurer in <u>Sereboff</u>, Liberty has not identified a specific account in which the funds are kept or proven that they are still in Cusson's possession.  However, the Court in <u>Sereboff</u> noted "'the familiar rul[e] of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing.'" 547 U.S. at 363-64 (quoting <u>Barnes v. Alexander</u>, 232 U.S. 117, 141 (1917)).  Here, the contract between Cusson and Liberty put Cusson on notice that she would be required to reimburse Liberty for an amount equal to what she might get from Social Security.  We therefore find that Liberty's counterclaim is an equitable claim and is allowed under 29 U.S.C. § 1132(a)(3).

592 F.3d at 231.

In the present case, little to no evidence was presented on the traceability of the funds made in the form of payments to Back to Health Chiropractic during the pertinent time period.

Both Dr. Korsen and Barlow testified as to the financial hardship caused by the termination of their relationship with Blue Cross, by the recoupment of a total of $32,928.77 by Blue Cross and by the termination of their complementary working relationship. Their testimony permits a common-sense inference that the payments they received from Blue Cross over the years have been expended on business expenses, grocery bills, rent, mortgage, and the other quotidian expenses of life.  On its side, Blue Cross presented no evidence about the status of the contested funds, and whether or not the funds remain in Dr. Korsen's or Barlow's possession.

However, Blue Cross argues that the status of the funds, and even their possible dissipation, is immaterial to their right of recovery, because the Provider Agreements, which specify that Blue Cross can collect overpayments, create an equitable lien by agreement identical to the lien identified by the Supreme Court in <u>Sereboff</u>.  The Court is not persuaded by this analogy.  The Sereboffs were on notice, by letter, from their insurer that it intended to claim their tort settlement, because the settlement proceeds constituted a duplicate payment for medical expenses already paid by the insurer.  This is significantly different from Blue Cross's action, which instead represented something more like an ambush.  After examining Back to Health's billing, Blue Cross drafted a new policy on intersegmental traction, and

-30-

applied it retroactively to recoup six-years' worth of payments for services rendered.  The First Circuit has previously "invoked our equitable and common law powers to prevent a plan from takings actions, even in good faith, which have the effect of 'sandbagging' claimants." Bard v. Boston Shipping Ass'n, 471 F.3d 229, 244 (1st Cir. 2006).  This Court, likewise, invokes those powers herein.

### *"In good conscience"*

Blue Cross cannot recover the monies already paid out to Dr. Korsen and Barlow because those monies are not sequestered in an identifiable fund, nor are they subject to an equitable lien. But Blue Cross's claim also fails on an additional prong.  In Great-West v. Knudson, the Supreme Court wrote that a claim for equitable restitution sought "money or property identified as belonging in good conscience to the plaintiff."  534 U.S. at 213 (emphasis added).  Despite Blue Cross's arguments to the contrary, it is wholly appropriate that this Court consider equity when analyzing a claim for equitable restitution. Laborer's Dist. Council Pension Fund v. Regan, 474 F.Supp.2d 279, 282-83 (D.N.H. 2007); Butler v. Aetna U.S. Healthcare, Inc., 109 F.Supp.2d 856, 863 (S.D. Ohio 2000)(citing Wells v. U.S. Steel & Carnegie Pension Fund, Inc., 950 F.2d 1244, 1255 (6th Cir. 1991)).  In addition, the Court may consider equity when determining the proper remedy under § 1132(a)(3)(B).  Bard, 471

F.3d at 244.

In this case, the equities weigh heavily in favor of Defendants Dr. Korsen and Barlow, both of whom did no wrong. Plaintiff failed to sufficiently rebut Defendants' evidence demonstrating that therapy on the intersegmental traction equipment is a form of mechanical traction, and one that has enjoyed acceptance throughout the chiropractic community.  Both Dr. Korsen and Barlow were excellent witnesses, who were credible and sincere.  Blue Cross's allegations of fraud were based on 1) its cursory and unsupported assessment that any experienced medical practitioner would know that intersegmental traction was not mechanical traction; and 2) its similarly precipitous judgment that Dr. Korsen's defensive behavior in the face of the Blue Cross audit demonstrated a guilty conscience.  Blue Cross's investigation into both the operation of the intersegmental traction equipment and the use of this equipment in the chiropractic community was limited and perfunctory.  Likewise, its assessment of Dr. Korsen's motives was hasty and indicative of its prejudgment.  Moreover, Blue Cross's failure to provide Dr. Korsen and Barlow with any meaningful review process, given the procedures specified by ERISA and included in their own Providers Agreements, was also unjust.  For all these reasons, the Court concludes that whatever monies Blue Cross paid to Back to Health for treatment on the intersegmental traction Table and

Chair, under billing code #97012, until the date of the publication of its new policy on intersegmental traction, rightfully, equitably and in good conscience belong to Dr. Korsen, Barlow and Back to Health.  Consequently, the Plaintiff can make no recovery in this case.

### Counterclaims

Dr. Korsen and Barlow have both brought counterclaims against Blue Cross, seeking payment for medical services for Blue Cross subscribers which were unrelated to the contested services. These payments were withheld by Blue Cross in an effort to recoup the monies paid to Dr. Korsen and Barlow for mechanical traction. The money withheld totals $18,447.21 from Dr. Korsen and $14,481.56 from Barlow.  These figures have not been contested by Plaintiff. Dr. Korsen and Barlow also seek an injunction against the withholding of future payments, and the costs of this lawsuit, including attorneys' fees.

When sitting in equity on an ERISA case, this Court has leeway to fashion an appropriate remedy.  Bard v. Boston Shipping Ass'n., 471 F.3d at 244.  In Bard, the First Circuit determined that using a "case-by-case approach, we tailor our resolution of the issues to the unique facts presented." Id. at 236.

In 2011 in Cigna Corp. v. Amara, 131 S.Ct. 1866, the Supreme Court delved further into the law books to suggest additional remedies available under ERISA's § 502(a)(3).  Citing an 1823

-33-

hornbook, the Court wrote, "Indeed, a maxim of equity states that equity suffers not a right to be without a remedy." Id. at 1879 (quoting R. Francis, Maxims of Equity 29 (1st Am. ed. 1823)). The Court stated that to the list of remedies set forth in Mertens – injunction, equitable restitution and mandamus – should be added contract reformation, equitable estoppel, surcharge and unjust enrichment. Id. at 1879-80.  In instructing the District Court who had avoided § 502(a)(3) because it determined that its remedies were too limited, the Supreme Court wrote, "In sum, contrary to the District Court's fears, the types of remedies the court entered here fall within the scope of the term 'appropriate equitable relief' in § 502(a)(3)." Id. at 1880.

In light of Bard and Cigna, and to avoid unjust enrichment, the Court orders Blue Cross to return $18,447.21 to Dr. Korsen and $14,481.56 to Barlow, representing the amount of services provided but not compensated by Blue Cross between May and December 2009.

## Conclusion

For the reasons stated above, the Court rules in favor of Defendants on Plaintiff's ERISA claim (Counts I and II of its Amended Complaint), and in favor of Defendants on their counterclaims.  Count III of Plaintiff's Amended Complaint against Dr. Korsen for defamation remains to be tried before a

jury.

No judgment shall enter on the ERISA claims at this time because there remain two unresolved issues to be addressed. First: what is the proper amount of prejudgment interest on Defendants' award?  The Court must determine not only the proper interest rate to be applied, but also how interest should be calculated in a case such as this where Defendants have been deprived of the use of their money in different amounts, for different periods of time.  Secondly, should Defendants be awarded counsel fees, and, if so, in what amount?  The Court has yet to determine whether this amount should include Dr. Korsen and Barlow's costs of defending this case, as well as prosecuting their counterclaims.

To assist the Court in analyzing these unresolved issues, the Court directs Defendants to brief the two issues and submit a memorandum to the Court no later than June 28, 2013.  Plaintiff shall file a response by July 26, 2013, and Defendants may reply no later than August 16, 2013.  The Court will set these matters down for hearing in September 2013.

It is so Ordered:


/s/Ronald R. Laqueux
Ronald R. Laqueux
Senior United States District Judge
May   22 , 2013


-35-